NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re CommVault Systems, Inc. Securities Litigation, | Civil Action No. 14-cv-5628 (PGS) <br><br> **MEMORANDUM AND ORDER** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on two motions, both filed by Defendants: (1) Motion to Dismiss the Second Amended Complaint (ECF No. 76); and (2) Motion to Strike the Expert Declarations attached to Plaintiffs' Seconded Amended Complaint (ECF No. 77).

Factual & Procedural Background:

On September 10, 2014, Lead Plaintiff, Arkansas Teacher Retirement Systems (hereinafter "Plaintiff" or "Arkansas Teacher")), commenced this securities class action by filing a Complaint. (ECF No. 1). On March 19, 2015, Plaintiff filed a First Amended Complaint. (ECF No. 40). On December 17, 2015, this Court granted Defendants' Motion to Dismiss the First Amended Complaint. (ECF No. 65). Specifically, the Court ruled that while Plaintiff alleged sufficient facts pertaining to the confidential witnesses (*see* ECF No. 75, T2:1-8:6 of Court's Decision), Plaintiff's "cookie jar" accounting theory was not sufficiently alleged. In so ruling, the Court determined that the allegation that Defendants violated GAAP through its "cookie jar" accounting is "an issue [that] requires some technical support in the pleading in

1

order to support the allegation." T8:25-9:2. Moreover, the Court reasoned that the "plaintiffs could demonstrate that the earnings that were allegedly deferred could be shown to have been earned in prior quarters. As such, the deferred reporting of sales must be supported by appropriate facts." T9:15-19.

On February 5, 2016, Plaintiff filed its Second Amended Complaint ("SAC") (ECF No. 70), which Defendants now seek to dismiss. In the SAC, Plaintiff relied upon the declarations of Harvey L. Pitt, the former Chairman of the Securities and Exchange Commission, and Harris Devor, a Certified Public Accountant, both of whom explained what the First Amended Complaint described loosely as "cookie jar accounting," and constitutes a GAAP violation. However, Defendants have filed a motion to strike the expert declarations attached to Plaintiff's SAC.

By way of background, CommVault is a provider of data and information management software, which derives about half of its annual revenue from licensing its software applications. (SAC ¶¶ 24-25). Defendant N. Robert Hammer (hereinafter "Hammer") was, at all relevant times during the class period, CommVault's Chairman, President and Chief Executive Officer (CEO). (SAC ¶ 21). During the class period, Hammer reviewed, approved, and signed CommVault's filings with the SEC. (Id.). Defendant Brian Carolan ("Carolan") was, at all relevant times during the class period, CommVault's Vice President and Chief Financial Officer (CFO) (Id. at ¶ 22). Carolan, like Hammer (collectively the "Individual Defendants"), reviewed and signed CommVault's filings with the SEC. (Id. at ¶ 23).

Beginning in 2003, CommVault entered into a business partnership with Dell, which continued, leading up to and after CommVault issued its initial public offering in 2006. (Id. at ¶ 6). Beginning in fiscal year 2007 through the beginning of the class period, CommVault relied

2

on Dell for approximately 20% of its total revenue.  (*Id.*).  Dell served as both a reseller and original equipment manufacturing partner to CommVault, meaning that Dell sold CommVault's software as a stand-alone product or as integrated into Dell hardware. (*Id.*).  During its partnership with Dell, from 2006 through 2012, CommVault's revenue quadrupled, growing from $109,472,000 to $406,639,000. (*Id.* at ¶ 7). Before the beginning of the class period, CommVault told investors to expect annual revenue to increase from approximately $500 million in fiscal year 2013 to $1 billion over the next few years.  (*Id.*).  Analysts predicted that, in order to meet that goal, CommVault must grow by at least 20% year-over-year until fiscal year 2017. (*Id.*).

In the latter half of 2012, Dell acquired certain CommVault competitors, including Quest Software, which ultimately ended the partnership between the companies.  (*Id.* at ¶ 7).

Plaintiffs allege that Defendants knew or recklessly disregarded that CommVault would not be able to meet 20% year-over-year revenue growth targets without Dell. (*Id.* at ¶ 8). Nonetheless, Defendants falsely reassured the investing public that they had replaced Dell with other business partners and that the loss of revenue from Dell had not and would not affect CommVault's achievement of its revenue target numbers.  (*Id.*).  Moreover, instead of adjusting their forecasts and disclosing the truth to investors, Defendants fraudulently concealed the decline in CommVault's business and manipulated their financial results (cookie jar accounting) in violation of Generally Accepted Accounting Principles (hereinafter "GAAP").  Specifically, instead of recognizing millions of dollars in software revenue that CommVault had earned in prior periods, Defendants deferred the earnings to later periods to show continued financial growth. It is alleged that this cookie jar accounting practice began at the end of fiscal year 2013, when the class period began and when CommVault announced their financial results. (*Id.* at ¶

3

27).  Because the within motion deals primarily with Plaintiff's cookie-jar accounting theory, the Court hones in on these allegations:

CommVault is obligated under the relevant GAAP and other accounting provisions and guidance to recognize software revenue when certain criteria are met. In the fourth quarter of fiscal 2013, CommVault achieved historic software revenue growth. Instead of recognizing software revenue on particular licensing transactions in that quarter, Defendants improperly created a "cookie jar" of deferred software revenue which had grown to $9.2 million by the end of fiscal year 2013.  (*Id.* at ¶27).  Former SEC Chairman Arthur Levitt described "cookie jars" as one of the main "gimmicks" used by public companies to manipulate their earnings: "they stash accruals in cookie jars during the good times and reach into them when needed in the bad times." The practice became popular in the 1990s and 2000s as the economic environment provided opportunities for companies to manipulate their earnings to produce more linear, stable results. (*Id.* at ¶ 28).  The practice of deferring the recognition of revenues to a later period in order to manipulate earnings is a GAAP violation. *See* Devor Decl. ¶22; Pitt Decl. ¶15. As referenced in the accounting literature described below and explained in the accompanying Pitt and Devor Declarations, when companies misleadingly shift revenue or earnings from one period to another for the purpose of making the latter period look better, it violates GAAP. This practice is known as "cookie jar" accounting, "earnings management" or "smoothing," and constitutes an improper manipulation of the subject financial statements. The use of such accounting manipulations is often tied to an entity's need to achieve or report predetermined financial results or stable earnings. (SAC ¶ 29).  The establishment and/or manipulation of so-called "cushion" or "cookie jar" reserves has been identified as an accounting practice where entities improperly use portions of the results from periods of good financial performance to set aside amounts (e.g., through the

creation of accruals or reserves) that can be reversed in future periods, when profits may be lower than management or market expectations. (*Id.* at ¶ 30). Creating a cookie jar to move revenue from one period to another is misleading because recognizing revenue and earnings in the proper periods is critical to the transparency of financial statements. Indeed, the accounting literature places significant emphasis on the fact that one of the goals of financial statements based on accrual accounting (as CommVault's were at all relevant times) "is to account in the periods in which they occur for the effects on an entity of transactions and other events and circumstances" through the use of the "matching principle" – matching revenues to the period to which they relate. *See* Devor Decl. ¶¶19-20 (citing FASCON 6). Moreover, accounting guidance requires that in order for financial information to be reliable, it must "faithfully represent[] what it purports to represent." Devor Decl. ¶16 (citing FASCON 2). (SAC ¶ 31).

"In view of such principles, it would be improper under GAAP to defer the recording of revenues to a later period if such revenue is both (1) realized and realizable and (2) earned, especially if the purpose of such is to manipulate earnings …." Devor Decl. ¶22. Here, "Plaintiff alleges that Defendants employed such a practice during the Class Period and that, by virtue of such, were able to report revenue growth measures that equaled estimates that had been communicated to the public." Devor Decl. ¶26. Accordingly, Devor concludes that "CommVault improperly utilized what is known in the accounting and investing worlds as 'cookie jar' accounting, in violation of GAAP." Devor Decl. ¶39. (SAC ¶ 32). Similarly as former Chairman Pitt explains, the use of a "cookie jar" to improperly smooth earnings creates "a fictitious or materially misleading picture of a company's actual results of operation . . . , and investors and shareholders are deceived." Pitt Decl. ¶15. (SAC ¶ 33).

In the fourth quarter of fiscal 2013, CommVault achieved historic software revenue

growth, and deferred record amounts of software revenue. Specifically, from the beginning of fiscal 2011 through the third quarter of fiscal 2013, the Company's balance in its deferred software revenue account was as low as $722,000 and was never greater than $3.1 million. (SAC ¶ 51). In the fourth quarter of fiscal 2013, CommVault's deferred software revenue jumped from $3.1 million to nearly $9.2 million. At the outset of the Class Period, Defendants improperly deferred revenue recognition on certain license sales to create a $9.2 million "cookie jar" reserve that they would use during the Class Period to hide from investors the fact that CommVault was unable to generate enough software revenue to meet its revenue growth targets. (*Id.* at ¶51).

Plaintiff also relies on confidential witnesses to corroborate its "cookie jar" accounting theory. For example, CW1 confirmed that "CommVault was skimming revenue off deferred revenue just to make the numbers look good." (SAC ¶52). CW4 similarly confirmed that when the Company had enough revenue for the current quarter, it would roll some over to the next quarter so that the next quarter would look good. (*Id.*) By deferring recognition of the software revenue put into its "cookie jar" until the second and third quarters of fiscal 2014, and then falsely attributing its ability to meet software revenue targets to "pure software license growth," Defendants were able to create the illusion that CommVault was still a high growth Company, notwithstanding the loss of its partnerships with Dell. (*Id.*).

Plaintiff also contends that the fluctuations in CommVault's deferred software balance reinforce this theme. (*Id.* at ¶ 53). CommVault's deferred software revenue balance increased during the otherwise excellent fourth quarter of 2013, and decreased during the second and third quarters of 2014, which, without the recognition of deferred software revenue from the "cookie jar," would not have met the 20% year-over-year growth threshold. Devor also noted this in his Declaration, indicating that the above witness statements are consistent with both his

understanding of a cookie jar accounting scheme and with the "growth and decline of the deferred revenue balances reflected in CommVault's public filings during the relevant timeframe." Devor Decl. ¶34. (*Id.* at ¶53).

This "cookie-jar" accounting caused a substantive increase in CommVault's deferred software revenue balance, increasing it by over $6 million, nearly three times greater than any other deferred software revenue increase in the previous five fiscal years. Plaintiffs allege that Defendants use of the cookie jar was to create the illusion that CommVault was meeting its 20% year-over-year growth targets.  These accounting manipulations concealed from investors the revenue deficiency caused by the loss of its partnership with Dell and the resulting sales force attrition.

Plaintiffs allege further that the Individual Defendants made false and misleading statements in SEC filings, conference calls, and industry conferences with securities analysts regarding CommVault's ability to replace its Dell business and the impact of deferred revenue as an indicator of growth.  Specifically, Plaintiffs allege that Defendants repeatedly downplayed the impact of deferred revenue, and told investors that there is no connection between CommVault's recognition of deferred revenue and its software revenue growth.

Finally, before the opening of the market of April 25, 2014, investors learned the truth about CommVault's decelerating software revenue and how the loss of its Dell partnership was a direct cause of the deceleration.  (SAC ¶ 150). On that day, CommVault announced that its fiscal fourth quarter profit had declined 7.8% and its software revenue decelerated to 10% year-over-year, half of the 20% growth investors expected.  (Id.).  Despite CommVault's insistence that deferred revenue was a meaningless indicator of growth, without recognition of deferred software licensing revenue, the company could no longer conceal the revenue growth

deceleration that it had been steadily experiencing due to the loss of its partnership with Dell.
(Id.)  Once the disclosure of the deceleration was made, the price of CommVault stock fell from
$68.58 per share to $47.56 per share, over 30%, wiping out nearly $1 billion of market value
(SAC ¶ 152).

<u>Legal Standard & Analysis:</u>

    <u>Motion To Strike</u>

    Because the Motion to Strike could potentially impact the adequacy of the allegations of
the Complaint, the Court will first address this motion.  Defendants contend that it is improper at
the pleading stage for Plaintiffs to include the declarations of experts in order to "fill factual
voids" in the Complaint.  Defendants rely primarily on two cases, *DeMarco v. Depo Tech Corp.*,
149 F.Supp.2d 1212 (S.D.Ca. 2001) and *Rose v. Bartle*, 871 F.2d 331 (3d Cir. 1989), for the
proposition that such declarations are improper.

    Plaintiff counters that it included these declarations in response to the Court's ruling that
"technical support" was needed in the pleading in order to adequately allege that Defendants'
cookie-jar accounting was improper.  Moreover, Plaintiffs contend that striking a pleading is a
particularly harsh remedy, which is not warranted in this case.  Plaintiffs rely on a number of
cases for the proposition that it is proper in securities fraud cases to rely upon expert testimony in
the pleading stage.

    Rule 10(c) provides in pertinent part: "A copy of any written instrument which is an
exhibit to a pleading is a part hereof for all purposes." Fed. R. Civ. P. 10(c); *DeMarco v.
DepoTech Corp.*, 149 F.Supp.2d 1212, 1220 (S.D.Ca. 2001).  A "written instrument" within the
meaning of Rule 10(c) "is a document evidencing legal rights or duties or giving formal
expression to a legal act or agreement, such as a deed, will, bond, lease, insurance policy or

security agreement." *Murphy v. Cadillac Rubber & Plastics, Inc.,* 946 F.Supp. 1108, 1115 (W.D.N.Y.1996).  Within this District, in *In re: Enzymotec Securities Litigation*, the Court permitted the use of expert declarations specifically in the context of a securities fraud case. 2015 WL 8784065 at * 19 (D.N.J. Dec. 15, 2015).  Specifically, the Court found that "[a]lthough the declaration of an outside expert . . . is admittedly not as strong as a confidential witness, the declaration of [the expert] only serves to supplement the allegations contained in the Amended Complaint."  *Id.* (relying on *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys*, 796 F.3d 313, 323 (5th Cir. 2014) *cert. denied sub nom. Amedisys, Inc. v. Pub. Employees' Ret. Sys. of Mississippi*, 135 S.Ct. 2892 (2015) (noting use of declaration of outside expert)).

Here, the Court finds that the declarations of Harvey L. Pitt, the former Chairman of the Securities and Exchange Commission, and Harris Devor, a Certified Public Accountant, are proper at the pleading stage, especially because the Court specifically indicated that technical support was required to support the GAAP violation.  Moreover, the declarations are adequately incorporated into the Complaint, and as such, only serve to supplement the factual basis alleged. More specifically, Plaintiffs do not rely exclusively on these expert declarations, but instead allege facts (*i.e.* highlight the amount of deferred revenue and include confidential witness testimony) in support of the "cookie jar" accounting theory.  Accordingly, Defendants' Motion to Strike the Expert Declarations is denied.

Motion to Dismiss Pursuant to Rule 12(b)(6)

Defendants seek dismissal of Plaintiff's Second Amended Complaint.  On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn

therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 556 U.S. at 678-79; *see also Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir. 1997). A complaint should be dismissed only if the well-pleaded alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium*, 214 F.3d 395, 397-98 (3d Cir. 2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant Corp*., 223 F.3d 165, 173 (3d Cir.), *cert. denied, Forbes v. Semerenko*, 531 U.S. 1149, 121 S. Ct. 1091 (2001). The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357 at 340). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact), . . . ." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65 (internal citations and quotations omitted).

1.      Heightened Pleading Pursuant to Rule 9(b) & the PLSRA

Securities fraud claims are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  Rule 9(b) provides, in relevant part:  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  This particularity requirement has been rigorously applied in securities fraud cases. See, e.g., *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir.1997).  Plaintiffs asserting securities fraud claims must specify "the who, what, when, where, and how: the first paragraph of any newspaper story." *In re Advanta Corp. Sec. Litig.*, 80 F.3d 525, 534 (3d Cir.1999) (quotations and citation omitted).  "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *In re Rockefeller Center Properties, Inc., Sec. Litig.*, 311 F.3d 198, 216 (3d Cir.2002) (quoting *In re Nice Sys., Ltd. Sec. Litig.*, 135 F.Supp.2d 551, 577 (D.N.J.2001)).  The rigid requirements of Rule 9(b) may be relaxed if it is shown that the requisite factual information is peculiarly within the defendants' knowledge or control.  See *In re Exxon Mobil Corp. Sec. Litig.*, 387 F.Supp.2d 407, 427 (D.N.J.2005) ("In order to receive the benefit of the relaxed standard, at the very least plaintiffs must allege that the necessary information lies within the defendants' control.") (internal quotations and citation omitted).  Failure to meet the threshold pleading requirements of Rule 9(b) justifies dismissal apart from Rule 12(b)(6). See *California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 145 (3d Cir.2004).

In addition to Rule 9(b), plaintiffs alleging securities fraud must also comply with the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4(b). See, e.g., *Rockefeller*, 311 F.3d at 217.  The PSLRA "imposes another layer of

factual particularity to allegations of securities fraud." *Id.* at 217.  A complaint that fails to comply with the requirements of the PSLRA must be dismissed. 15 U.S .C. § 78u-4(b)(3)(A). The PSLRA requires that a complaint which asserts a Section 10(b) claim must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

> 2.      Violations of Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Among the rules and regulations promulgated under Section 10(b), Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,...
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In a securities fraud action brought pursuant to Section 10(b) and Rule 10b-5, the basic elements to be alleged by a plaintiff are: (1) a material misrepresentation or omission by the

defendant; (2) scienter, i.e., a wrongful state of mind on the part of the defendant; (3) in connection

with the purchase or sale of a security; (4) reliance, often referred to in fraud-on-the-market cases

as "transaction causation;" (5) economic loss; and (6) "loss causation," i.e., a causal connection

between the material misrepresentation and the loss. *Dura Pharmaceuticals, Inc. v. Broudo*, 544

U.S. 336, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005).

With respect to allegations of misleading statements and omissions, such as those made

under Rule 10b-5(b), the PSLRA requires plaintiffs to "specify each statement alleged to have

been misleading, the reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, the complaint shall state

with particularity the facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  This

provision requires plaintiffs to set forth the details of allegedly fraudulent statements or

omissions, including "who was involved, where the events took place, when the events took

place, and why any statements were misleading." *Rockefeller*, 311 F.3d at 217.  Plaintiffs are not

required to "plead with particularity every single fact upon which their beliefs concerning false

or misleading statements are based.  Rather, plaintiffs need only plead with particularity

*sufficient* facts to support those facts." *California Public Employees' Retirement Systems v.*

*Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004) (emphasis in original).

Although the PSLRA is "silent regarding the source of the plaintiff's facts" when

"plaintiffs rely on confidential personal sources . . . they need not name their sources as long as

the . . . facts provide an adequate basis for believing that the defendants' statements were false."

*Id.* at 146-47.  When assessing the particularity of the allegations made regarding confidential

informants, the court must examine "the detail provided by the confidential sources, the sources'

basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged,

including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Id.* at 147.  A plaintiff's failure to aver "when any of [the confidential witnesses] were employed by [Defendant] . . . the dates that [the] sources acquired the information, or how any of [the] former employees had access to such information" is insufficient because it forces the court to speculate "whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor." *Id.* at 148.

In applying these standards, Plaintiff's Complaint meets the PSLRA's particularity standards for allegations made on "information and belief."  As this Court previously ruled, Plaintiffs "have sufficiently alleged the confidential witnesses, their dates of employment, their job description and their relevant responsibility [and] to whom they reported."  ECF No. 75, T6:5-8.  Moreover, the Court discounted Defendants' argument that the CW's, as low level employees, would not have first-hand knowledge of the information and were relying on gossip.  Specifically, this Court previously found that "employees in the marketing departments, especially at the level of the confidential witnesses, most likely had the firsthand knowledge as to the impact occurring on the ground, and whether CommVault could meet its growth targets."  T7:18-21.  Moreover, "the sales force would know the pulse of the company, and would often communicate among the different sales territories in order to facilitate leads and to learn about problems the company was experiencing . . . [T]hey were most likely relying upon sales activity."  T7:23-8:4.

As to the GAAP violations and "cookie jar" accounting, the Court finds that the SAC adequately addresses the shortfalls in the FAC, and sufficiently alleges this theory.  As *USA Today* defined, cookie jar accounting is a practice "in which a company uses generous reserves from a good year against losses that might be incurred in bad years."  Not only does Plaintiff supplement the factual allegations with the expert declarations, but the Complaint also

14

adequately explained the requirements under GAAP and why "cookie jar" accounting is improper.  (SAC ¶¶ 34-47).  Moreover, Plaintiff identifies CommVault's internal accounting methods.  (SAC ¶¶48-53).  Defendants take issue with the tax upon which the CW's relied to show a GAAP violation.  Specifically, Defendants assert that these CW's lack first-hand knowledge of accounting, and that the Complaint fails to link the allegations of deferring commissions with the alleged GAAP violation.  However, when considering the Complaint as a whole, Plaintiff has set forth a plausible claim.  For example, CW1 confirmed that "CommVault was skimming revenue off deferred revenue just to make the numbers look good." CW4 similarly confirmed that when the Company had enough revenue for the current quarter, it would roll some over to the next quarter so that the next quarter would look good. By deferring recognition of the software revenue put into its "cookie jar" until the second and third quarters of fiscal 2014, and then falsely attributing its ability to meet software revenue targets to "pure software license growth,"

Defendants were able to create the illusion that CommVault was still a high growth Company, notwithstanding the loss of its partnerships with Dell.  (SAC ¶ 52).  These allegations, coupled with the confidential witnesses and the cookie jar accounting allegations are sufficient pleading stage.

In sum, the allegations regarding the loss of Dell, juxtaposed with Defendants' representations to the investing public that they had replaced Dell's business, are sufficient to make out a claim that Defendants made false or materially misleading statements.

Materiality

Defendants assert that Plaintiff has not shown that Defendants made materially misleading statements regarding deferred software revenue or CommVault's relationship with

Dell.  With respect to the first element, that is, the materiality of the statement or omission, there must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of the information available.  *In re Advanta Corp.*, 180 F.3d at 538 (internal quotation omitted).  Moreover, "the materiality of disclosed information may be measured post hoc by looking at the movement, in the period immediately following disclosure, of the price of the firm's stock."  *In re Able Laboratories*, 2008 WL 1967509 at *14 (D.N.J 2008) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1425).

Here, Plaintiff alleges that CommVault's stock was traded on the NASDAQ (FAC ¶ 16) and that the stock price plunged from $68.58 per share to $47.56 per share, or over 30%, wiping out nearly $1 billion of market value (SAC ¶ 16) after CommVault disclosed that it was unable to replace its Dell business and meet its growth targets of 20% year-over-year.  The SAC also identified numerous statements made during the class period that allegedly were misstatements or omissions of material facts related to CommVault's partnership with Dell and ability to meet growth targets.  Specifically, Defendants touted the strength of the Dell relationship in May 8, 2012 (SAC ¶ 60) and as late as May 2013 wherein Defendants represented that "we have successfully shifted most of our SMB [small and medium business] business to non-Dell distribution partners."  (SAC ¶ 65).  When CommVault's inability to replace the Dell revenue completely was disclosed prior to the market opening on April 25, 2014, the market reacted quickly and adversely.  Alleging, as the SAC does here, the significant decrease in stock price immediately following CommVault's disclosure, satisfied the pleading standard for materiality.

Scienter

With respect to claims that require proof that the defendants acted with a particular state of mind, such as those made under any of the three subsections of Rule 10b-5, the PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  In order to determine whether a complaint's scienter allegations can survive a threshold inspection for sufficiency, a court must "engage in a comparative evaluation; it must consider not only inference urged by the plaintiff but also competing inferences rationally drawn from the facts alleged." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2504-05 (2007).  In making this determination, "courts must consider the complaint in its entirety. . . The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509.  In actions under Rule 10b-5, a plaintiff may establish the requisite strong inference of scienter by stating either: "(1) facts which show that defendants had both motive and opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior." *Advanta*, *supra,* 180 F.3d at 534-35.  Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *In re Advanta Corp.*, 180 F.3d at 535 (internal quotation omitted).

Here, Plaintiff has alleged sufficient facts giving rise to the strong inference that, throughout the class period, Defendants knew or recklessly disregarded that, contrary to their

repeated public statements, CommVault was experiencing decelerating software growth due to the loss of its partnership with Dell, and that the company improperly deferred software revenue to hide from investors the truth about decelerating revenue growth.  When examining the complaint holistically, it raises a strong inference of Defendants' scienter.   Initially, the fact that the allegations of fraud pertain the CommVault's core business, that is, software licensing revenue, may impute knowledge on the Defendants.  *In re Campbell Soup Co Sec. Lit.*, 145 F.Supp.2d 574, 599 (D.N.J. 2001).  Moreover, Plaintiffs have alleged significant circumstantial evidence giving rise to a strong inference of scienter.  For example, the 2013 Chicago meeting, openly discussing the loss of Dell's business, indicates that Defendants knew that replacing Dell would be a challenge.  Moreover, Defendants emphatic and repeated denial of the impact of the loss of Dell and the effect of deferred revenue on growth demonstrates that, at minimum, they were reckless in disregarding investor's concerns on these issues.  Finally, Hammer's sale of his stock demonstrates that he an opportunity to commit fraud.  Specifically, Plaintiffs allege that Hammer sold more than 268,500 shares of CommVault during the class period, for proceeds of more than $18.6 million.   To the extent that Defendants contend that this was merely an exercise of options that were set to expire, this is a factual question outside the Complaint. Moreover, Plaintiff goes further and alleged the temporal proximity between Hammer's representations that the deferred revenue was unrelated to growth.  Specifically, on February 11, 2014, Hammer represented that deferred revenue would not impact growth, and two days later, Hammer sold 44,630 shares for proceeds of over $3 million. (SAC ¶ 173).  Four days after that, on February 18, 2014, Hammer sold another 68,851 shares for proceeds of nearly $5 million. (*Id*.) On March 5, 2014, Hammer sold another 148,339 shares for over $10 million.  (*Id*.)

Accordingly, Plaintiffs have alleged sufficient facts giving rise to a strong inference of scienter.

Loss Causation

With regard to loss causation, the PSLRA requires plaintiffs in securities actions to carry the burden of "proving that the act or omission of the defendant...caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).  The Third Circuit has addressed this issue and found that plaintiffs must show that there is both: (1) a sufficient causal connection between the alleged loss and the alleged misrepresentations; and (2) that the stock price dropped in response to the disclosure of the alleged misrepresentations.  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 183-87 (3d Cir.2000).  If a plaintiff cannot demonstrate a causal nexus exists between the stock price drop identified, and the misleading statement or omissions of which the plaintiff complains, a plaintiff has failed carry the burden of proving proximate causation and the claims must be dismissed.  *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S.Ct. 1627,1634 (2005).  The "causation issue becomes most critical at the proof stage.  Whether the plaintiff has proven causation is usually reserved for the trier of fact." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir.2000).  The Court must view the allegations "in a light most favorable to the Section 10(b) plaintiff" and avoid making determinations on factual issues during a motion to dismiss.  *In re MobileMedia Securities Litig.*, 28 F.Supp.2d 901, 940 (D.N.J.1998).

Here, the parties do not dispute loss causation, and, as already provided, CommVault's stock price plunged from $68.58 per share to $47.56 per share, or over 30%, wiping out nearly $1 billion of market value (SAC ¶ 265) after CommVault disclosed that it was unable to replace its Dell business and meet its growth targets of 20% year-over-year.  Therefore, Plaintiff have sufficiently pled loss causation.

For all of the foregoing reason, Defendants' Motion to Dismiss is denied.

ORDER

IT IS on this 30th day of September, 2016;

ORDERED that the Motion to Dismiss the Second Amended Complaint (ECF No. 76) is denied; and it is further;

ORDERED that the Motion to Strike the Expert Declarations attached to Plaintiffs' Seconded Amended Complaint (ECF No. 77) is denied.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

20